Nicholson, C. J.,
delivered the opinion of the Court.
James B. Eeynolds died intestate, owning a large real estate near Clarksville, where he had lived, and leaving his brother Joseph and his sister Elizabeth, his only heirs. His property was partitioned between them, and in the division, Elizabeth became the owner of about 300 acres of the land. She was soon afterwards married to John D. Dolan, with whom, before the marriage, she entered into a contract, by which she retained the absolute title to all her property, reserving the same to her own sole *595 and separate use, with all the powers of a feme sole. She expressly retained the right of selling or disposing of her property in any way she might choose. Shortly before her death, in May, 1859, she and her husband entered into a contract with W. N. Bilbo, for the sale of her land near Clarksville, at $250 per acre. Their contract was reduced to writing and signed by the parties.
Soon after the death of Elizabeth Dolan, her brother Joseph, assuming to be the owner of her real estate as her sole heir, conveyed the same to two trustees, for the benefit of his daughter, Mary J. Brandon, and his step-daughter, Ellen Gorrill, with remainder interests to their children, and providing an annuity of $180, for a needy Mr. Thompson.
Some months after the death of Elizabeth Dolan, a bill was filed by Bilbo, against Dolan and the heirs of Mrs. Dolan, to set up and have enforced the contract of sale between Mrs. Dolan and himself, in relation to the land. His bill was demurred to, because he had not made the administrator of Mrs. Dolan, a party, and because he had not deposited in court with his bill, $5,000, which, by the contract, he was to have paid in óash. The demurrer was sustained, but leave given to amend the bill, in order that the administrator of Mrs. Dolan might be made a party; and time was given to Bilbo to make a deposit of the money. The bill was amended, and John D. Dolan, as administrator of his wife, was made a party.
It was the interest of Dolan that Bilbo’s contract *596 for the sale of the land should be set up¿ and enforced. In that event he would become entitled, as husband, to the entire proceeds of the land. But if the contract should be defeated, the land would descend to the heirs of his wife, and he would get nothing.
Bilbo was insolvent and unable to raise the $5,000, but Dolan had the means and undertook to furnish the money. Upon this fact becoming known to Joseph Reynolds and the trustees, and adult beneficiaries under his deed, they all entered into a contract of compromise and family settlement with Dolan, by which he agreed to abandon his claim to the proceeds of the land as husband, upon the agreement to pay him $10,000, out of the proceeds of the sale of the land. This contract and settlement was executed by Joseph Reynolds, the acting trustee T„ W. King, and all the adult beneficiaries, under the advice and approval of the solicitors of the minor beneficiaries, as well as of the other parties. When this contract was made, Dolan withdrew from Bilbo’s suit, and it was dismissed on account of bis inability to deposit the $5,000.
It was understood that the contract of compromise would not be binding on the minors, unless it was ratified by the Chancery Court. For this purpose, and in order to have the sanction of that court to a sale of the land in pursuance of the terms of the trust deed, and to raise the $10,000, for Dolan, and for carrying out the other provisions of the trust deed, the bill in this case was filed by Joseph Reynolds, the' maker of the deed, King the acting trustee, and Brandon one of the adult *597 beneficiaries; against David Gorrill, tlie married women and minors, as defendants.
The Chancellor was appealed to for a decree of ratification of the contract of compromise and settlement, and lor sale of the lands.
Proof was taken, and a decree was made, ratifying the settlement as being to the interest of all parties, complainants and defendants, and an order for the sale of the land in pursuance of the trust deed. The Clerk and Master was ordered to take proof and report as to the indebtedness of the trust estate, and as to the separate interests of the several beneficiaries under the trust deed. Upon the final decree, in November, 1866, exceptions were taken to the Master’s report by three of the adult beneficiaries, who were not satisfied with the ruling of the Chancellor, and two of them, viz: Mrs. Gorrill and Mrs. Brandon, appealed to the Supreme Court. At December Term, 1867, the Supreme Court affirmed the decree of the Chancellor, with a slight modification as to the interest of Mrs. Thompson, one of the adult beneficiaries Avho had not appealed.
At the December Term, 1868, Brandon, the husband of Mary J. Brandon, for the benefit of the infant beneficiaries, filed the transcript for writ of error, which brings the cause back to this court for a second time.
The first question which presents itself, is, whether the decree made by this court, at its December Term, 1867, upon the appeal taken by Brandon and wife and by Ellen Gorrill, is conclusive upon the infant beneficiaries, who bring the cause here now by writ of error? *598 We find, that when this cause was before the court in December, 1867, an opinion was filed by Judge Milli-gan, in which some doubt on this question was intimated by the court; but, notwithstanding, they proceeded to confirm the decree of the Chancery Court, without any saving clause as to the minor pai’ties, for whose benefit the suit is now prosecuted. Judge Milligan said: “In the asjzect of this record, we feel doubtful, whether or not we can make any very authoritative decree with reference to the Bilbo compromise, so far as the minors are concerned, as they have not appealed. But, as the record appears, we are constrained to confirm the Chancellor’s decree, except so far as it allows the exception to the Master’s report, in relation to Mrs. Thompson’s interest, under the deed of trust. This exception will be overruled, and the Master’s report, in relation thereto, confirmed; and in all other respects the decree is confirmed.” Accordingly a decree was entered confirming the decree of the Chancellor, with the exception as to Mrs. Thompson’s interest.
It is obvious that Judge Milligan had no doubt as to the propriety of confirming the decree ratifying the Bilbo compromise, except that he doubted whether the appeal by the two adult beneficiaries, brought the cause up as to the minors. The decree was made, however, over his doubts, and probably under a belief that the compromise was a proper one, and it was properly made, so far as the effect of the appeal by two of .the parties, is concerned, as we have had more than one occasion to hold, during the present term.
But, as we infer from the opinion of Judge Milligan, *599 and from the manner in which the record was presented to the court, that the question as to the propriety or validity of the compromise and settlement, was not intended by the parties to be passed upon by the court on the appeal, we feel that we are not precluded from examining now, the grounds on which the compromise is sought to be sustained on the one side, and set aside on the other.
In this view of the case, we shall state the conclusions at which we have arrived, after a careful examination of the record, without elaborating the various questions discussed at the bar.
The controversy arose out of the question, whether Mrs. Dolan, at the time of her death, was seized of the land in controversy, as realty; or whether by her contract with Bilbo, it was converted into personalty. The solution of this question depended upon two other questions; first, whether under the marriage agreement she had the power to sell the land; and next, whether the contract with Bilbo was subsisting and valid, at the time of her death.
By reference to the marriage contract, it appears, that “all the real property which she had inherited from her brother, Jas. B. Reynolds,” and all her personal property, “shall remain and enure to the sole use and benefit of the said Elizabeth Reynolds, subject to her uncontrolled disposition and pleasure, as much so as if she remained an unmarried woman,” as well as all property, real, personal, and mixed, which may hereafter accrue to her,” “with the further right of selling and disposing of it by her last will and testament.”
*600 'We see no difficulty in arriving at the true intent and purpose.of this contract. It was the purpose and meaning of Mrs. Dolan, that she would retain the absolute power of disposing of all her property, either by selling or by last will and testament, as fully as if she had remained unmarried. The language employed clearly expresses this purpose and intention. It follows, that she had the power to sell the land to Bilbo, and if the contract made between them was subsisting and valid at the time of her death, it was, in law, a conversion of the realty into personalty.
’Whether 'the contract was subsisting and valid at the time of her death, depended upon facts to bo established by proof. To induce the Chancellor to ratify the compromise and settlement between the parties, complainants have taken proof bearing upon these questions. Such facts were proven as satisfied the Chancellor that there was real doubt as to the rights of the contesting parties, and such doubts as rendered it a proper case, in the judgment of the Chancellor, looking to the interests of all parties, minors, as Well as adults, for the ratification of the compromise and settlement. In pursuance of the prayer of the adult parties, sanctioned by the advice and counsel of their solicitors, the Chancellor ratified and confirmed the contract. But now one of the adult parties who procured this decree to be made by the Chancellor, brings the case here by writ of error, for the benefit of the minors, and insists that this court, on the same proof, and with no further developments of facts, should reverse the decree below, and declare the compromise and settlement null and void as to the *601 infant beneficiaries. It is our duty to do this, if the proof fails to make out such a case of compromise of doubtful rights, as justifies the interposition of a court of equity.
First, as to the fact, whether the contract between Mrs. Dolan and Bilbo was subsisting and in force when she died. On this point, H. S. Kimble, a witness, states, that about the last of January, 1869, he drew up a contract between Mr. and Mrs. Dolan, on one side, and Bilbo on the other, which was signed by Mr. Dolan and Bilbo, and was to be submitted to Mrs. Dolan, by witness, for her signature, in the event she would consent to substitute it for the contract already executed. Witness says, that a short time before her death, he met with Mrs. Dolan, and mentioned the matter of the new contract to her, when she said she preferred the old contract to stand. From his conversation with her, witness was of opinion, up to her death, that the contract of sale to Bilbo still subsisted.
On the same point, R. W. McClure proved, that sometime in April, 1859, he visited Mrs. Dolan for the purpose of buying the land in controversy. He offered to give her $60,000, paying $10,000, in hand. She said she was sorry witness was too late; that they had sold the property to a man in Nashville, and that the papers were signed, sealed and delivered; that they could do nothing now. Witness then said to her, “When you and John die, what will you do with your large estate?” She said, if she outlived Mr. Dolan, it would be hers, and if he outlived her, it would be his.” This conver *602 sation bad reference to her sale to Bilbo, and occurred only a few days before her death.
We find nothing in the proof which materially weakens the force of this evidence. So little, that we are forced to conclude, that in all probability, Mrs. Dolan died under the belief that the land was sold to Bilbo, and that the proceeds, after her death, would belong to her husband; and that she had waived the prompt payment of the $5,000.
Next, as to the validity of the contract with Bilbo. This involves the question of fraud in the procurement of the contract, which has been discussed at the bar with much earnestness.
It is a singular fact, that, in the bill filed in this case, to have the compromise ratified by the Chancellor, it is alleged that complainants had discovered that Bilbo and Dolan were in league with each other, and were acting in concert for the purpose of' setting up and enforcing the contract of sale between Mrs. Dolan and Bilbo, and for fear they might succeed and thereby cut complainants out of the entire estate, complainants allege they agreed to compromise with Dolan, thereby giving up $10,000 of their claim to make sure of $50,000. And the fact of such a league between Dolan and Bilbo is presented as a reason why they made the compromise and why the Chancellor ought to ratify it. It is urged as a matter of merit,'in the bill, that, by the compromise the suit of Bilbo was defeated. But, after the Chancellor yielded to the persuasive and convincing arguments thus addressed to him, and granted their prayer, and after resting for *603 over a year upon the decree so procured, this court is appealed to and urged to reverse that decree, for the same reason on which the Chancellor was asked to make it. It is now argued, that Dolan and Bilbo entered into a fraudulent league and combination to obtain title to the land in controversy, through the contract between Mrs. Dolan and Bilbo, which, it is insisted, was procured by the fraudulent league between Dolan and Bilbo, aided by James M. Davidson, an attorney, who drew and witnessed the contract. This charge of fraud is based upon no newly discovered facts, but is sought to be inferred from the same proof, which was taken to induce the Chancellor to ratify the compromise.
The proof does show, that Avhen Bilbo filed his bill to set up and enforce his contract, and when the Chancellor required him to deposit the advance payment of |5,000, by a given day, that Dolan, who was interested largely in setting up Bilbo’s contract, agreed to assist him in raising the required amount. We are unable to see any grounds for charging this as a fraudulent combination. They had a common interest in setting up the contract; if it was set uu, Bilbo would get the land, and Dolan the price to be paid for it. Nor "do we see that it was any evidence of fraud, that Dolan took out letters of administration upon the estate of his wife. That was the only legal mode by which he could set up his claim to the proceeds of the land; and it is shown by the evidence of McClure, that Mrs. Dolan had full information as to the legal effect of her sale to Bilbo; she told McClure that if her husband outlived her he would get it all.
*604 Nor are we able, after closely scrutinizing the deposition of James M. Davidson, to find in it any grounds on which he could be implicated in a fraudulent conspiracy against Mrs. Dolan. He proves that she entered into the contract, after having been fully informed as to the terms and legal effect of it, and that she understood its provisions, was satisfied with them, and signed the paper freely and voluntarily. It is shown that Bilbo was insolvent, but the terms of the contract guarded her against that by requiring $5,000 to be paid in advance. It is evident that it was intended by Bilbo to be a speculation. But, as far as the facts are developed in the record, we see nothing on which we are justified in attributing fraud to Dolan, Bilbo or Davidson. What facts outside of the record indicating fraud may exist, we have no right to know, nor has it been suggested that any such do exist. The proof falls so far short of showing, that the contract between Mrs. Dolan and Bilbo was procured by fraud, that the preponderance in favor of the fairness and validity of the agreement is strong and decided. The greatest wonder we feel, after examing the whole case, is, that Dolan should have compromised a claim for $60,000, resting on such proof as we find in the record, for one-sixth of the amount. Looking to this proof, we are unable to see how the Chancellor, having a proper regard for the minor beneficiaries, could have done anything else than to ratify the compromise and settlement.
We have already stated that, upon the death of Elizabeth Dolan, her brother, Joseph Beynolds, claimed the land in controversy, as her only heir. He immedi *605 ately conveyed the same in trust to T, W. King and G. A. Harrell, for the use and benefit of his own family. Harrell failing to act as trustee, and doubts arising as to the power of King, the remaining trustee, to go on and execute the trusts of the deed, the bill in this case was filed by King as well as by Jos. Reynolds and the other adult beneficiaries, for the purpose of having the instructions and directions of the Chancellor in executing the trusts, and for the additional purpose of obtaining the sanction of the court to the family settlement and compromise made with Dolan. Such applications to Courts of Chancery, by trustees, for instructions and directions, are of every day occurrence: Story’s Eq., § 1267; Adams’ Eq., 379.
The questions discussed at the bar, as to the power of the Chancellor to decree the sale of lands belonging to infants, are not properly involved in this case. The power to sell is given in the deed to the two trustees; and upon the refusal of one to serve, it was proper for the remaining trustee to apply to a Court of Chancery for its aid in carrying out the provisions of the trust deed. The fact that a compromise of a doubtful litigation had been made, rendered it still more necessary for the application to the Chancellor, not only to procure his sanction of the compromise, but of having an appropriation of a sufficient amount of the trust funds to satisfy the sum agreed to be paid to Dolan, for a relinquishment of his claim to the proceeds of the land.
The jurisdiction of a court of equity to enforce and ratify contracts for the compromise of doubtful rights, is too well settled to require to be supported by authorities.
In the Union Bank v. Geary, 5 Peters, 99., it is said, that *606 compromises are to be favored, whatever the nature of the controversy compromised. In Moore v. Fitzwater, 2 Randolph, 442, it was said, “whether the title at the time of the contract was in the appellant or appellee, we do not deem it material to inquire. It is sufficient, that the parties themselves have settled the question; and as there was no fraud or undue advantage, we would not disturb it, even if assured that the appellees had no title.”
Where a doubtful question arises, such as a question of construction upon a will, it is extremely reasonable that parties should terminate their differences by dividing the stake between them, in the proportion which may be agreed upon: Naylor v. Winch, 1 S. & S., 564. In Trigg v. Read, 5 Hum., 545, Judge Turley said: “In the cases of family compromises, all that need be said here is, that agreements affecting them are upheld with a strong hand, and an equity has been administered in regard to them, which has not been applied to agreements generally, upon the ground that the honor and peace of families make it just and proper to do so: 1 Story’s Eq., § 132.
Whenever a court of Chancery is called upon to sanction and enforce a contract of compromise, which involves the rights and interests of minors, it is bound, in the exercise of its general superintendence and protective jurisdiction over the persons and property of infants, to see that their rights and interests are not injuriously affected by such contract. They must have their day in court; they must be represented by guardians ad litem; the proof must satisfy the conscience of the Chancellor that their rights and interests are promoted and secured by the compromise. When these requisites are complied with, it is not simply the right, but the duty of the Chancellor to *607 uphold and enforce such compromises, especially where they settle family disputes, and put an end to litigation as to doubtful rights. If the Chancery Court could not exercise its jurisdiction for the protection of the rights and interests of minors in such cases, the law extends to them less protection than it extends to adults.
We are satisfied that the jurisdiction of the Chancellor was rightfully and judiciously exercised in the, case before us, and we affirm his decree.